## Case No. 10,646.

### PACIFIC COAST WRECKING CO. v. The EASTPORT.[1]

District Court, D. California. March 27, 1876.

#### SALVAGE—COMPENSATION.

[A steamer bound to San Francisco, having become disabled near the mouth of the harbor by striking upon rocks, came to anchor, and sent the mate with three seamen to San Francisco for a tug. The next morning a steamer passing up the coast was discovered, which, upon request, took the vessel in tow. On reaching the mouth of the harbor, a tug, which had been engaged, was met, and the vessel was taken in tow by her, the steamer turning back upon her course. The time of service by the steamer was two hours, and the total time lost from her voyage was three and one-half to four hours. The weather was fair, the injured vessel was in no danger, and there was no hazard connected with the service. The tug had agreed to bring the vessel in for $125; the value of the tow was about $60,000, and that of the towing steamer about $20,000. It appearing that $2,000 had been offered and refused, and $7,500 demanded, *held*, that the offer was fair and liberal, and a decree for that amount should be entered.]

In admiralty.

M. Andrus, for libellants.

McAllister & Bergen, for respondents.

HOFFMAN, District Judge. About 11 o'clock on the night of April 2, 1875, the steamer Eastport, then on a voyage from this port to Coos Bay, struck on the water edge of Duxbury reef. She "pounded" on the rocks for a few minutes, when she came off with the loss of her rudder and rudder post and one blade of her propeller. An anchor was at once let go, and an attempt made to devise a steering apparatus by means of the long boat. This seems to have proved unsuccessful, and a new contrivance was resorted to, by the aid of which the vessel succeeded in reaching a point some six miles distant from the Heads. The falling of the wind, and the situation of the vessel, which, with defective steering apparatus, rendered an attempt to pass between the "Potato Patch" and the shore dangerous, induced the master to again bring her to an anchor. Shortly after the accident he had dispatched the second mate and three seamen in a boat with instructions to proceed to this city, report to the owners, and obtain the aid of a tug. A little before seven o'clock of the next day the steamer Mary Taylor, bound on a voyage up the coast, was discovered; she was signaled and requested to tow the Eastport to San Francisco, to which her master assented. A hawser was passed on board the Eastport, and she was towed to the mouth of the harbor where the steam tug Look-Out, which had been dispatched to the relief of the disabled steamer, was encountered. The Mary Taylor thereupon cast off the Eastport, and, turning back, resumed her voyage. The latter vessel

was towed to her wharf by the tug. The time occupied in the service was about two hours. From the time the Mary Taylor commenced towing until she reached the place where she began the service, it was three and one-half or four hours. The distance was about six miles. The value of the Eastport was about $60,000. That of the Mary Taylor about $20,000.

The service was attended with no danger. It was in no respect arduous, and its successful performance was at no time doubtful. The tug would, had she not met the vessel, have reached the place where the Eastport lay in about two hours. She had agreed to perform the service for $125. At the time the Mary Taylor took hold of the Eastport, the latter was in no immediate danger. An attempt was made to show that it was possible the Eastport might have dragged her anchors before the tug could have arrived. But I see but little ground for this suggestion. The wind did not blow with any unusual violence until much later in the day, and the steamer had one spare anchor to let go, in case of emergency. She could also, perhaps, have used her propeller, after casting off the jury rudder which had been rigged. There can, I think, be no reasonable ground to doubt that if the Mary Taylor had not engaged in the service, it would have been successfully performed by the tug. If the appearance of the latter had been entirely accidental, the fact that she would have arrived in time to effect the service ought not perhaps to be much considered in estimating the danger of the Eastport's situation. But she had been sent for and was on her way, and this, not because she was accidentally found ready to undertake the enterprise, but because the Eastport lay very near to the entrance of the harbor, within sight of Fort Point, and near enough to the city to command all the assistance which its resources could furnish.

I think, therefore, that under all the circumstances it cannot be said that the Eastport was in any serious danger, either imminent or prospective. Relief was in point of fact near, and relief could in her position be reasonably expected. The only doubt respecting its arrival which could have been felt would be caused by the uncertainty whether the boat dispatched for assistance had succeeded in reaching the city. But the duty on which it was sent does not appear to have been considered dangerous. It was, so far as we know, undertaken with alacrity. It was certainly performed with success. It is not suggested that the performance of the service was attended with any risk whatever to the Mary Taylor. It is to be distinguished from an ordinary towage service chiefly by one feature. The vessel was not a towboat. She was a steamer performing a regular voyage. To effect the salvage she was obliged to deviate and return to the port from which she had sailed. In a somewhat similar case $500 on a value of $12,000 to $14,000 was allowed

to a tug by this court for hauling off a vessel from the vicinity of rocks and towing her to the wharf. The service occupied about three hours, but the danger to the vessel was in that case more imminent. On the other hand, the service of the tug differed but slightly from her ordinary employment. In the case at bar the value of the salved property was about $60,000, but a tug was ready and willing to perform the service for $125.

In the cases of The Oak Hill [Case No. 10,-391] and The Annapolis [Id. 406], this court had occasion to examine at some length the rules and analogies by which courts are guided in fixing the compensation for services of this description. It is unnecessary here to cite the authorities referred to in those cases. The insurance company appear to have offered the libellants $2,000 in gold as a just compensation. The offer was refused and $7,500 demanded. I consider the offer fair, even liberal. I doubt whether, if it had not been made, I should have decreed as much. No money has been paid into court. But I think it proper to discourage, so far as it lies in my power, such extravagant pretensions as those set up by the libellants. I shall therefore decree to them the sum of $2,000, but without costs.